## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

*vs.*                              **Criminal Case No.  2:05CR13**

**JOHNNY RAY FANCHER,**

        **Defendant.**

## OPINION/REPORT AND RECOMMENDATION

May 31, 2005 Defendant filed his Motion To Suppress Evidence.  Defendant's Motion seeks the suppression of "all evidence seized from his residence during [an] illegal warrantless seizure and all evidence that flows therefrom, including a later forensic examination of defendant's computer system." Defendant's Motion p. 3.   The United State filed Government's Response To Motion To Suppress on June 6, 2005.  An evidentiary hearing was held on Defendant's motion on June 7, 2005.  During the June 7, 2005 hearing, Trooper Andrew Loudin testified.  No other testimony was offered by either side and the record was closed and the matter submitted for decision.

### Statement of Facts

The following statement of the facts pertinent to the issues raised by Defendant's Motion To Suppress is based on the testimony of West Virginia State Police Trooper Andrew Loudin received during the hearing of June 7, 2005.

On October 11, 2004, the police received a telephone call from DHHR Child Protective Service Officer Allyson Scott concerning three alleged young victims of sexual abuse by a person named "Johnny."  Scott advised Trooper Loudin that one of the alleged victims was coming in to be interviewed that afternoon or evening.  Trooper Loudin attended the interview.  The police immediately initiated a criminal investigation.  On October 11, 2004, the police learned that the

person named "Johnny" was likely Johnny Ray Fancher.  The police learned that the oldest of the

victims was a student at the Romney School for the Deaf and Blind.  The school nurse told the

police  she had observed signs of sexual abuse in the child.  The police then arranged to have the

child seen at Ruby Memorial Hospital in Morgantown, West Virginia.  Trooper Loudin, a state

policeman with one-year total experience in police work,  interviewed the victim at Ruby Memorial

Hospital, learning information similar to that which had been told by another of the victims: 1) each

of the victims had been in Defendant's home; 2) Fancher was a church-school bus driver who drove

children to and from their homes to church Sunday school; 3) each had been on the bus when it had

been driven by Fancher and had been taken by Fancher to his home in Elkins on occasions where

each had been subjected to sexual abuse as opposed to sexual assault; and 4) each described Fancher

as having a little black book.  The police also learned that Fancher's brother-in-law  was the pastor

of the church where Sunday school was held.

The police checked Fancher's criminal history and discovered he was  convicted as a sex

offender in two other states and, therefore, was required to register as a sex offender in West

Virginia.  Trooper Loudin familiarized himself with the terms and conditions of Fancher's sex

registration and determined he had reported he did not have internet service.  According to Fancher's

Sex Offender Update filed on July 19, 2004, his internet at Cambridge had been canceled and

Fancher did not have a screen name.

On October 12, 2004, at approximately 3:30 p.m., Trooper Loudin drove his state police

cruiser to Fancher's residence located at 62 ½ 11th Street, Elkins, West Virginia.  Senior Trooper

Boggs accompanied Trooper Loudin in a separate police cruiser.  Trooper Loudin's cruiser was

equipped with a video camera which permitted him to remotely capture audio.  Trooper Loudin

activated the video camera, upon arriving at Fancher's house. Trooper Loudin and Senior Trooper Boggs knocked on Fancher's door four separate times over a period of three to four minutes. They could hear shuffling and walking sounds from inside of the residence and knew someone was inside.

When Fancher answered the door, Trooper Loudin, dressed in uniform, asked Fancher what took him so long to answer the door. Fancher responded that he had been on the internet with his sister. Trooper Loudin asked Fancher if he could come in to Fancher's residence and take a quick look around. Fancher said: "Go For It." Once inside, Trooper Loudin asked Fancher if he could take a quick look at the computer located in the living room. The living room was located in the front of the house near the front door raising additional suspicion with Trooper Loudin as to why it took Fancher so long to answer the door since he said he was on the internet with his sister when the officers knocked. Fancher again responded: "Go For It." When Trooper Loudin looked at Fancher's computer, he noted that an icon to a program, "History Kill," was showing and numbers were also running indicating to him that a "History Erase" or "History Kill" program was running. The trooper did not see any other files open and running on the computer. During the time the audio tape was running between 3:47 and 3:58 p.m., Fancher told Trooper Loudin that his internet service had been stopped and that he got it re-connected about four days prior to the officers arrival. During this same period of time, Senior Trooper Boggs did something to turn off the computer.

Trooper Loudin also saw a little black spiral type notebook next to the computer with notations of internet sites and addresses such as "Little Angels.com.", "Topless Teens.com", "underground photo preteen nudes" and "download theses and all preteen models as possible before they become blocked." (Government Exhibit B attached to its Response) Trooper Loudin also saw three photographs hanging on the wall that appeared to be young girls between the age of five and

seven- years old, clothed and posed provocatively.

Trooper Loudin testified that the notations of internet sites and addresses could have been addresses for adult pornography and that he did not see any image of a child or person showing on the desktop screen of the computer prior to it being turned off.

Fancher told the police he lived alone since his son left after turning eighteen years of age. Trooper Loudin observed two items of undergarments ordinarily worn by women on the floor. Trooper Loudin asked Fancher if he wore the undergarments. Fancher denied that he wore them and offered no explanation for their presence. This further raised Trooper Loudin's suspicions.

Trooper Loudin and Senior Trooper Boggs had a brief discussion and decided they had enough to get a search warrant for Fancher's house. Trooper Loudin drove to the Randolph County Prosecuting Attorney's office to discuss the search warrant, leaving Senior Trooper Boggs and Fancher at Fancher's house.

Trooper Loudin was unable to convince the Prosecuting Attorney that he had probable cause for a search warrant. Trooper Loudin believed the Prosecuting Attorney misunderstood what Loudin wanted. He concluded the Prosecuting Attorney thought he wanted a search warrant for the sexual abuse case instead of for possession and receiving of child pornography. Unsuccessful in his attempt to get the support of the Prosecuting Attorney for a search warrant, Trooper Loudin returned to the Fancher residence.

By the time Trooper Loudin returned, Senior Trooper Clark had arrived and began photographing the pictures on the wall before the pictures were removed. Once removed from the wall, the officers found additional pictures behind the provocative pictures. The additional pictures were of young females in the nude. Trooper Loudin then advised Fancher of his Miranda rights

and started to ask him questions in connection with the claims of sexual abuse. Trooper Loudin then asked Fancher if the police could do a more detailed search. Fancher said he was uncomfortable with giving them permission. The officers construed Fancher's statement as a withdrawal of his previously given consent to search.

Trooper Loudin and Senior Trooper Boggs conversed again. The officers were aware that Fancher was related (brother-in-law) to the pastor of the church that provided the Sunday church school bus and that the pastor had come to one of the victim's houses and attempted to persuade that person against going forward with a criminal investigation and charges against Fancher even though the pastor was aware that Fancher was a registered sex offender.

As a result, the officers decided to call State Magistrate Good in an attempt to obtain a search warrant for Fancher's residence. Good was the magistrate on call for Randolph County at the time. She also had a law degree. Senior Trooper Boggs placed a telephone call to Magistrate Good at her home shortly after 5:00 p.m. Magistrate Good explained she believed the officers had probable cause for a search warrant but she could not issue one for at least four hours because her office was being exterminated. Neither officers nor the Magistrate suggested they meet at the Magistrate's house or at another location other than her office to submit a search warrant application even though the officers knew they had search warrant forms at their barracks and the forms were available at the Prosecuting Attorney's office. Nothing prevented the officers from asking Magistrate Good to go to the Prosecuting Attorney's office, which was located across the street from the Magistrate's office or to meet the officers at another location. Trooper Loudin's explanation was that they did not think to do that, nor did they think to go to the State Circuit Court Judge for a search warrant. Trooper Loudin did not think the state police had sufficient manpower, or that his supervisor would

permit the use of that limited manpower, to station of an officer to secure Fancher's residence until a search warrant could be obtained. Trooper Loudin did not ask a superior if they could secure and post security at the Fancher residence. Trooper Loudin testified that they probably could have secured the residence for one hour but not for four hours. The officers also knew they could request local police or the sheriff's department to assist in securing the Fancher residence while a search warrant was secured but did not request such assistance. Trooper Loudin and Senior Trooper Boggs discussed their concern that if they vacated the Fancher property, someone could come in and tamper with the computer and any evidence that may be in it. The officers were aware that no one other than Fancher was in the house. The police believed the exigent circumstances that existed dictating seizure, rather than waiting until a warrant could be issued, was the lack of ability to get a state search warrant until 2100 hours because the Magistrate's office was being exterminated.

The troopers took Fancher into custody for alleged misdemeanor violation of the sex offender registration act; seized Fancher's computer; removed the black spiral notebook; seized the pictures that had been removed from the walls; and padlocked the front door of the residence with the lock found in the Fancher residence. None of the officers asked Fancher if they could seize his computer or spiral notebook. The officers did not use the consent to search form they carry in their cruisers, and they did not modify that form to get authorization from Fancher to seize his computer or the black spiral notebook. The officers did not seize the female underwear observed on the floor near the bed in the Fancher house. The officers logged in the evidence seized and secured it in their evidence locker. As previously noted, the police located the additional pictures showing young girls in the nude behind the provocative pictures on the living room walls.

The troopers obtained a state search warrant the next day to search the Fancher residence

and executed it, finding CDROM disks which they seized along with other evidence.  None of the evidence seized from this search was subject to Defendant's Motion To Suppress.

The troopers did not search the computer.  They  turned it over to the FBI on October 19, 2004, and the FBI obtained a federal search warrant to search the computer's contents on October 25, 2005.

**Issues Presented**

**Discussion**

**The Fourth Amendment**

The Fourth Amendment to the Constitution of the United States reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue**,** but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

**Probable Cause**

**Consent**

Warrantless entries into a person's home are presumed unreasonable.  *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.E.2d 639 (1980). *United States v. Turner*, 650 F.2d 526, 528 (4th Cir. 1981).  However, in the instant case, the officers entered Defendant Fancher's dwelling  with his expressed consent.  Trooper Loudin asked if the officers could come in and look around to which Fancher responded, "Go For It."

Once inside, Loudin gave consent for the officers to take a quick look at his computer again responding to the request, "Go For It."

Therefore, the undersigned concludes that the warrantless entry and visual search of Defendant Fancher's residence on October 12, 2004, was justified by Fancher's expressed consent.

**Scope Of Search**

Trooper Loudin asked Fancher if he had anything he wasn't supposed to have under the terms of his sex offender registration, and they asked Fancher if he would mind if Trooper Loudin looked around a bit.  Fancher responded, "Go For It."  It was during this consented search that the computer, the pictures on the wall, women's underwear, and the spiral notebook were observed by Trooper Loudin.  It was also before the consent to search was revoked by Fancher that the provocative pictures were removed from the wall and the nude pictures of what appeared to be young girls  were discovered.

Since it comes within an established exception to the Fourth Amendment warrant requirement, a consensual search may not exceed the scope of the consent to give.  The Government bears the burden of proving that the search and seizure did not exceed the scope of the suspect's consent to search.  The standard for measuring the scope of a suspect's consent is that of objective reasonableness, which looks at what the typical reasonable person would have understood by the exchange between the officer and the suspect.  *United States v. Turner*, 169 F.3d 84 (1st Cir. 1999).

It is reasonable to conclude from Trooper Loudin's conversation with Fancher as he entered the residence that Trooper Loudin was checking up on Fancher's status as a registered sex offender and wanted to make sure Fancher did not have anything in the house that he was not supposed to have.  From the moment of entry to the point when Trooper Loudin told Fancher he was

investigating sexual abuse allegations, [1]Fancher gave consent to look around his house to see if something was visible that he was not supposed to have.  The undersigned concludes that such consent did not include looking in and opening up files within Fancher's computer or removing pictures from the wall to look behind them to see if anything else was hidden – in other words, to see what may be there in plain view.

**Plain View**

The United States argues and the undersigned agrees that the seizures of the computer, black spiral notebook and the photographs on the wall were authorized by the consent to search and the plain view doctrine.

"Under the 'plain view doctrine,' a police officer may properly seize evidence of a crime without a warrant if: (1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent, i.e., the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself."  *United States v. Carey*, 172 F.3d 1268 (10th Cir. 1999).

In the instant case, if there was anything incriminating about the computer, it was not readily apparent to Trooper Loudin.  The trooper testified the screen was blank of any images except for the "History Kill" icon and numbers moving indicating the program was running.  He further testified that it was not unlawful for Fancher to have a computer or, to have a computer attached to the internet.  The unlawful act on which Fancher was arrested was failing to give notice of a change in

---

[1]After Loudin returned from the Prosecuting Attorney's office in his unsuccessful attempt to secure support for a search warrant, Trooper Loundin told Fancher the real reason the officers were there, advised Fancher of his rights and asked if he could search his computer; Fancher told Trooper Loudin he did not feel comfortable with that, thereby revoking his prior consent.

his sex registration within ten days of his internet service being originally connected, disconnected or reconnected. Chapter 15, Article 12, Section 3 of the West Virginia Code provides:

> When any person required to register under this article changes his or her residence, address, place of employment or occupation, vehicle information required by section two of this article, or school or training facility which he or she is attending, or when any of the other information required by this article changes, he or she shall, within ten business days, inform the West Virginia state police of the changes in the manner prescribed by the superintendent of state police in procedural rules promulgated in accordance with the provisions of article three, chapter twenty-nine-a of this code.

Chapter 15, Article 12, Section 3 (d)(8) of the West Virginia Code provides:

> Persons required to register under the provisions of this article shall provide or cooperate in providing, at a minimum, the following when registering: (8) Information relating to any internet accounts the registrant has and the screen names, user names or aliases the registrant uses on the internet.

Chapter 15, Article 12, Section 8 of the West Virginia Code provides:

> Except as provided in this section, any person required to register under this article who knowingly provides false information or who refuses to provide accurate information when so required by terms of this article, or who knowingly fails to register or knowingly fails to provide a change in any information as required by this article, is guilty of a misdemeanor and, upon conviction thereof, shall be fined not less than two hundred fifty dollars nor more than ten thousand dollars or imprisoned in the county or regional jail not more than one year, or both: Provided, That each time the person has a change in any of the registration information as required by this article and fails to register the change or changes, each failure to register each separate item of information changed shall constitute a separate offense.

Trooper Loudin knew Fancher filed his last Sex Offender Update on July 19, 2004 stating his "Internet Provider(s) and Account(s) Internet at Cambridge has be[en] cancelled." The officers were at Fancher's residence on October 12, 2004. Fancher told Trooper Loudin that it took him a long time to come to answer the door because he was talking to his sister on the internet. Trooper Loudin observed the computer and the spiral bound black note book next to each other in the living room of Fancher's residence. Trooper Loudin saw that the "History Kill" was running on the

computer.          Notwithstanding Trooper Loudin's testimony, these circumstances and observations

taken together would permit any reasonable officer to seize the computer which was in plain view

during the consented to search as immediately apparent incriminating evidence of the misdemeanor

crime of failing to timely update sex offender registration. *Horton v. California* 496 U.S. 128, 110

S.Ct. 2301, 110 L.Ed.2d 112 (1990). It is important to note that although the police seized Fancher's

computer, they did not search its hard drive. A search of the hard drive was done only upon the

issuance of a federal search warrant on application by the FBI. In this respect, the computer is much

like the container in *Horton:* "Even if item seized is container, its seizure does not compromise

interest in preserving privacy of its contents, because it may only be opened pursuant to either a

search warrant, or one of well -delineated exceptions to warrant requirement."

　　　　With respect to the spiral notebook, Trooper Loudin testified that the noted internet sites

could have been adult sites and there was nothing in the wording of the "Little Angel.com" cite to

indicate contraband or evidence of a crime. However, "Topless Teens.com" cite and the notations

"download these and all preteen models as possible before they become blocked," "underground

photos preteen nudes," and "underground pre-puberty nudes" are, by their very wording, of

incriminating character relative to the failure to timely update sex offender registration.

　　　　Similarly, the pictures on the wall were of what appeared to the officers to be children

clothed and provocatively posed. From a plain view standpoint, there was nothing showing in the

pictures that indicated they were contraband or evidence of a crime. The officers removed the

provocative pictures from the wall and only then did they discover that behind the provocative

pictures were pictures of what appeared to be young girls posed in the nude. This discovery was

made before Fancher withdrew his consent for the police to conduct further searches.

The officers were not obligated to ignore the pictures hanging on Fancher's wall or the spiral notebook because they may not be directly connected to the failure to timely amend sex offender registration charge. The police were not required to ignore evidence of the spiral notebook described by the victims of Fancher's alleged sexual abuse or pictures on the wall of young children simply because the charge has not yet been made. In this case, the police had probable cause based on what the children and parent had told them to obtain a warrant search Fancher's house for evidence of the sexual abuse crime. That probable cause coupled with Fancher's consent was sufficient for the police to search and to seize evidence which was in plain view which was incriminating. The notebook was particularly incriminating. The pictures on the wall were also incriminating since they involved young nude female children.

**Seizure**

"A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656 80 L.Ed.2d 85 (1984).

**Exigent Circumstances Exception To The Warrant Requirement**

The only reason this case comes to the Court is because the officers seized a computer, a spiral bound small black notebook, and pictures hanging on the wall from Fancher's residence when their attempts to secure a search warrant were frustrated by a State Magistrate who felt she could not issue a warrant for a period of approximately four hours because her office was being exterminated for bugs.

"Exigent circumstances can arise when evidence might be destroyed before a search warrant could be obtained and police need not produce concrete proof that the evidence was on the verge

of destruction." *United States v. Grissett*, 925 F.2d 776, 778 (4th Cir. 1991).

"[T]here is no precise formula since emergency circumstances will vary from case to case and the inherent necessities of each situation must be scrutinized." *United States v. Reed,* 935 F.2d 641 (4th Cir. 1991).

"[T]he proper inquiry focuses on what an objective officer could reasonably believe." *Id.*

"The existence of exigent circumstances must be determined as of the moment of the warrantless entry of the officers onto the premises. . . ." *Arkansas v. Sanders*, 442 U.S. 753, 763, 99 S.Ct. 2586, 2592, 61 L.Ed.2d 235(1979). "[T]he appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers." *United States v. Wysocki*, 457 F.2d 1155, 1160 (5th Cir.), *cert. denied*, 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.105 (1972).

In the *Reed* case, *supra,* the West Virginia State troopers were investigating Reed for sexual abuse and battery of his young children. During the process of the investigation, the officers went to Reed's mobile home on the afternoon of September 13, 1990, to question him. As in the instant case, the Reed officers did not go armed with a warrant because no arrest was contemplated at the time. However, the Reed officers were aware of Reed's criminal background, which included assault, brandishing weapons and that Reed had been known to carry firearms. Upon arrival at Reed's mobile home, the officers found the door more than half open, thereby permitting them to see a man sleeping on a couch with a sawed off shotgun. Seeing the weapon and recognizing that it constituted a federal crime, the officers immediately entered the mobile home and seized the shotgun. The man on the couch was not Reed. When Reed finally arrived, he was armed with a revolver but offered no resistence. Reed admitted the shotgun was his. He was later charged with

possession of a sawed - off shotgun.  The immediacy presented in *Reed* is the belief that "the sawed-off shotgun would have been hidden or removed if they [the police] had delayed the seizure until a warrant was obtained."  The *Reed* Court aptly noted: "Standing at the threshold of Reed's home and uncertain about how many persons were present in the trailer, the officers in this case were faced with an inherently dangerous illegal weapon that could have easily been removed or hidden, or possibly used against them.  Viewing the situation in its totality, the troopers could have reasonably found exigent circumstances justifying seizure of the sawed-off shotgun." *Id.* 643.

It cannot be ignored that significant distinctions between *Reed* and the instant case exist. *Reed* involved a sawed off shotgun in proximity to an unknown sleeping subject in Reed's home. The police did not know how many other persons may be in Reed's home at the time.   The police knew Reed's criminal history included assault and the carrying of weapons.  To wait for a warrant could reasonably be perceived by the police as giving time for whoever was in the Reed residence to discover the presence of the police and react by arming him/herself for confrontation with the police or some how destroying the evidence.  By contrast, in Fancher,  the police were not faced with the use or possible destruction of a dangerous and deadly illegal weapon.  The police knew Fancher was alone in his house.  The police could have secured Fancher in the house or arrested and removed him as they ultimately did, thus removing the only person present who could destroy evidence.

In *United States v. Campbell,* 945 F.2d 713 (4th Cir. 1991), the Court reversed the trial court's refusal to suppress evidence removed from Campbell's home pursuant to a warrantless search finding that exigent circumstances did not exist.   The police were investigating a drug dealer by the name of Bibb in Alexandria, Virginia.  During the investigation, Drug Enforcement Agent

Manara arranged to purchase a significant quantity of cocaine in instalments from Bibb. The police followed Bibb when he went to get the first instalment of cocaine. Bibb went to 3540 Ewell Street, Campbell's residence, and returned to the restaurant and delivered the cocaine to the waiting Manara. Bibb was promptly arrested. During questioning, Bibb disclosed to the police that he had gotten the cocaine from Elizabeth Campbell at the Campbell residence and that there was a large quantity of cocaine still at the house. Bibb stated that he did not know what Elizabeth Campbell would do with the rest of the cocaine if he did not return promptly with the money for the first instalment. The police went to Campbell's residence, knocked twice and when no one answered, forcibly entered the house. The police found Elizabeth Campbell inside the house wearing a dress dusted with cocaine residue. During a protective sweep of the house, the police observed a significant amount of drugs. While police waited at the house, other police went to secure a search warrant which was used to conduct a search and seize the already observed drugs in the Campbell residence.

Again, there are significant similarities and significant differences between the *Campbell* case and the situation which confronted the police in Fancher. In both cases, the facts known at the time were almost certainly sufficient to obtain a search warrant.[2] In Fancher, the police had seen the computer, the provocative pictures on the wall, the "History Kill" program running on the screen of the computer monitor, and the small black spiral notebook during the consensual search. In Fancher, the police knew Fancher was the only one present in the house because of the consensual search. In *Campbell,* the police knew only what Bibb had told them. In *Campbell*, the police did

<hr />

[2]Magistrate Good told Trooper Loudin she believe there was sufficient basis in fact for her to issue a warrant.

not make an attempt to obtain a search warrant for more than an hour. The police in Fancher tried unsuccessfully two times to get someone to authorize the issuance of a search warrant or come out and issue a search warrant and were told first that they did not have probable cause and second that the State Magistrate on call would not be able to come out for approximately four hours.

In reversing the trial court's denial of defendant's suppression motion, Judge Widener, writing for the three judge panel in *Campbell*, explained:

> In this case, the government's stated exigency was the possibility that Elizabeth Campbell might destroy evidence of illegal narcotics activity located at the Ewell Street residence before the officers would be able to obtain a search warrant. The only evidence offered by the government on this point is the statement of Bibb when arrested that if he didn't return promptly, he didn't know what Mrs. Campbell would do with the contraband remaining on the premises. Despite this knowledge, the fact remains that the agents delayed for one hour without making any attempt to obtain a search warrant. Further, there was no showing that obtaining a warrant initially would have been difficult or time consuming. In fact, the record indicates that almost certainly there was probable cause, based on other information in the agents' possession, to obtain a search warrant for the residence prior to August 11, 1988, a finding we should not now make, however. Finally, if there was any concern about destruction of additional evidence in the immediate aftermath of the arrest of Bibb, that was not demonstrated by the wait of an hour. These facts, and especially the delay of one hour, simply do not support a finding of exigent circumstances to justify the warrantless entry. *Id.* 715. [internal citations omitted].

The only concern the police had in Fancher with respect to a third party destroying evidence in Fancher's house arose from the mother of one of the sexual abuse victims telling the police that Fancher's brother-in-law, the pastor, had tried to talk them out of pressing an investigation of Fancher. The police knew from conversation with State Magistrate Good that once she went to her office, she would issue the warrant. There is no evidence that getting the warrant would be difficult. Given that no one apparently thought to ask if the Magistrate would come out to a place other than her office, it cannot be said that getting the warrant would be time consuming. Finally, as in *Campbell*, if there was concern about destruction of evidence, that concern is not borne out by the

facts that sometime the next day, the officer did get a search warrant and did search Fancher's house again, seizing CD's. The women's undergarments, as well as the CD's, were still there and had not been disturbed. The police had to use bolt cutters to cut off the padlock they had used to lock Fancher's door the afternoon before.

In *United States v. Grissett*, 925 F.2d 776, 778 (4th Cir. 1991), the Court, in affirming a District Court's refusal to suppress evidence seized by a warrantless police search of a motel room, held:

> Exigent circumstances can arise when the evidence might be destroyed before a search warrant could be obtained. The police need not, as appellants suggest, produce concrete proof that the occupants of the room were on the verge of destroying evidence; rather, the proper inquiry focuses on what an objective officer could reasonably believe. See, e.g., *United States v. Socey*, 846 F.2d 1439, 1446 (D.C.Cir. 1988). Since the police had identified themselves before smelling the marijuana, an officer could reasonably conclude that the occupants of the room[3] would attempt to dispose of the evidence before the police could return with a warrant. This is especially true in the case of an easily disposable substance like drugs.

Once again, there are significant differences in the facts confronting the officers in *Grissett* and the facts confronting the officers in Fancher. First, there were at least four people (Grissett and three others) in room 523 at the time the police smelled the odor of marijuana coming from the open door. In Fancher, there was only Fancher present in the house when the police arrived, and the police arrested and removed him before pad locking the door to the house. Second, the occupants of room 523 could have destroyed the drug evidence while the police went to get a search warrant.

---

[3]The police went to the room because an armed man they confronted in the motel lobby did not have any ID but told the police that an individual in Room 523 could identify him. Upon arrival at room 523, the officers knocked and identified themselves as officers. Grissett opened the door and stepped into the hallway leaving the door partially open. The police smelled marijuana emanating from the open door and could see three other individuals in the room.

Fancher was removed from the house and no longer able to destroy the evidence in the house; the house was pad locked reducing the likelihood that others might destroy evidence in Fancher's behalf; and whatever destruction of evidence that existed on the hard drive, had already taken place before Senior Trooper Boggs stopped the running History Kill program by shutting down the computer (turning the computer off).

In the civil forfeiture action of *United States v. Taylor*, 90 F.3d 903 (4th Cir. 1996), against property allegedly used in illegal gambling, Judge Wilkins, writing for the Court, affirmed the District Court's denial of Defendant's motion to suppress evidence seized by the police and used as evidence. Defendant alleged that the money and property seized were seized as a result of a search that violated their Fourth Amendment rights. After dark, the police arrived at Taylor's residence to return a firearm. As the police walked to the residence, they were able to see inside a well-lit dining room where two men were seated at a table. The police knocked on the door and Taylor opened it. He appeared startled and nervous and placed himself in a position so as to block the sight of the police into the house. The police explained their purpose and asked to step into the house to get a receipt signed. Taylor indicated he needed to secure his dog or get his wife and closed the door. The police heard the click of the door lock. They also heard sounds of scurrying inside the house. One of the officers stepped sideways and looked through the open vertical blinds of a picture window. The officer could plainly see a large amount of currency and a plastic bag containing white powder on top of the table and individuals moving around in the house. He also observed someone throw a sheet over the table just before the blinds were closed. With that, the police ordered Taylor to open the door. After several minutes, he did so. As one of the officers was telling Taylor that the police needed to come into the house because they had observed drugs and

money on the table, the other officer observed an automatic weapon on the dining room floor. Upon entering the residence, the police had to subdue one individual who appeared to be making a try for the gun on the floor. After the two officers got control of the situation and while they were waiting for backup, one of them removed the sheet from the table exposing gambling records and a large amount of cash. The plastic bag of white powder was no longer on the table. After the county sheriff arrived, Taylor consented to a search of his house, resulting in the discovery of rolled coins and currency in other areas of the house which, when added to that which was on the dining room table, amounted to $61,433.04. Judge Wilkins wrote: "Under these circumstances, the district court did not clearly err in finding that Trooper Lane had a reasonable basis for concluding that there was probable cause to believe that criminal activity was in progress in the house and that there was imminent danger the evidence would be destroyed unless the officers immediately entered the house and took possession of it." *Id.* 909-910.

In *United States v. Turner, supra,* the police knew from an informant that Turner and Jones were using Turner's apartment to distribute cocaine. On October 20, Turner told the informant that he was expecting a shipment of cocaine that evening. The informant returned to buy cocaine at 8:30 p.m. The informant told the police he saw Kelly snorting or bagging a substantial quantity of cocaine and that he saw a large plastic bag of cocaine on the coffee table in the living room. Turner also told the informant that he planned to move the cocaine to another location. The police began the process of preparing an affidavit for a search warrant. At approximately 10:00 p.m. police surveillance saw Turner leave the apartment. The police arrested Turner in a parking lot three-hundred to four-hundred feet from the apartment. Fearing that Kelly, who was still inside the apartment, may have seen the arrest and realizing it would take two or three hours over the one hour

or more that had already passed, the police called the state prosecutor, explained the situation and received instructions to enter the apartment.  Using Turner's keys, the police entered the apartment, arrested Kelly, determined no one else was present, and observed the clear plastic bag of cocaine on the table in the living room.  As the police were leaving the apartment, Turner arrived and was arrested with contraband found on his person.  The police then completed the affidavit, secured a search warrant and went back to the apartment and seized the plastic bag of one-hundred-twenty-five grams of cocaine.

In writing for the Court, Judge Butzner recognized that the emergency circumstances which may justify application of the exigent circumstance exception to the warrant requirement under the Fourth Amendment "will vary from case to case and the inherent necessities of the situation at the time must be scrutinized."  *Id.* 528 citing *United States v. Rubin*, 474 F.2d, 262, 268 (3rd Cir. 1973).

Applying the five factors set forth in *Rubin, Id.* at 268-269, the Court in *Turner* held:

> We believe that the findings of the district court satisfy pertinent factors mentioned in Rubin and that its conclusion that the warrantless entry was justified is correct. First, the court found a high degree of urgency.  While the officers were in the process of obtaining a warrant, circumstances beyond their control made it impractical for them to do so before entering the apartment.  Second, it found that there was a rational basis for their belief that Kelly could have seen Turner's arrest. The apartment afforded a view of the parking lot, and although the arrest occurred at night, the area was lighted.  Moreover, additional police called to the scene to assist in Turner's arrest arrived in a van with flashing lights.  Third, the court found that there was a rational basis for the officers' belief that Kelly might destroy the evidence.  Fourth, while the court made no specific finding on the destructibility of the contraband, appellants admit that the cocaine seized at the apartment was readily destructible.  All of these circumstances led the district court to conclude that the officers reasonably believed that they were confronted with an emergency in which the delay necessary to obtain a warrant would enable Kelly to destroy the evidence.

In turning aside Turner's argument that the warrantless entry was unjustified because the police did not know that the cocaine was being destroyed, the Court distinguished the facts in

Turner's case from those in *Vale v. Louisiana*, 399 U.S. 30, 90 S. Ct. 1969, 26 L.Ed.2d 409 (1970). In *Vale*, the facts precluded resort to exigent circumstances because: "the goods ultimately seized were not in the process of destruction." *Id.* at 35. Vale was arrested in front of a house known to contain drugs and at a time when police knew no one was inside. By contrast, in *Turner,* the police knew the drugs and Kelly were in the apartment and that Kelly could have seen the arrest of Turner and could destroy the cocaine.

The totality of the circumstances apparent to the police at the time they made the decision to seize the computer, spiral notebook and pictures on the walls from Fancher's house without a warrant were:

1) The officers utilized the consents given to observe a computer with a "Kill or Erase History" program running, provocative pictures hanging on the wall, a small black spiral type note book open next to the computer in the living room revealing web sites suggestive to the officers of child pornography such as "Little Angels.com" and female undergarments on the bedroom floor.

2) None of these materials were immediately seized by the police.

3) These materials coupled with:

    A) Defendant's criminal history requiring registration in West Virginia as a sex offender.

    B) The information police had from interviews of two of the alleged child victims and one of their parents including:

        i) that the church bus driver, Johnny, took the girls to his home where he subjected him to sexual abuse and they described observing a little black

notebook;

ii)     that the brother-in-law of Defendant was the pastor of the church and church school and had approached one of the victim's families in an effort to stop prosecution of the Defendant.

C)     The information from Defendant's sex offender registration form indicating that he did not have internet access.

D)     Statements by Defendant to the police that the reason it took him so long to answer the door was because he was talking to his sister on the internet which had been re-instated approximately 4 days prior to the arrival of the police and that he had lived alone since his son left after turning 18 years of age.

E)     State magistrate's expressed belief that the police had probable cause for the issuance of a warrant for the search of Defendant's residence but that she could not issue the warrant for approximately 4 hours because her office was being exterminated for bugs.

F)     Trooper Loudin's, a state trooper with approximately one year of experience, belief that his supervisors would not approve the use of manpower to secure Fancher's residence while waiting for the state magistrate's office to issue the search warrant.

Applying the following general factors relevant to a determination of the existence of exigent circumstances

(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police

guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband." *United States v. Reed,* 935 F.2d 641, (4th Cir. 1991)

the undersigned concludes:

1)       There was no urgency and given the availability of the state magistrate in less than four hours or sooner if someone had thought to ask the magistrate on call to come to some other place than her office to sign search warrant papers the police had on hand at their barracks, the amount of time necessary to secure the search warrant was not significant.

2)       The officer's belief that the contraband (computer, spiral notebook and pictures hanging on the wall were about to be removed or destroyed was not reasonable particularly when that belief was based solely on the concern over the reported attempt by the Pastor to get one of the victims' parents not to proceed with a criminal investigation of Fancher.

3)       There was virtually no possibility of danger to the police guarding the site had they done so while waiting for a warrant to be issued.

4)       Fancher was aware the police were on his trail but his ability to destroy or remove the contraband before a warrant was issued for his residence ended when he was arrested and removed from the residence.

5)       The contraband was not readily destructible because there was no one besides Fancher in the house; the police removed Fancher from the house; and the police pad locked the house as they left.

The undersigned concludes that the officer's reliance on exigent circumstances exception to the warrant requirement of the Fourth Amendment is misplaced and is not a valid justification for

the officer's seizure of the computer, the spiral notebook and pictures that were removed from the wall in Fancher's house.

**Good Faith Exception:**

The United States orally raised the "good faith exception" in support of its opposition to Defendant's Motion To Suppress. The Fourth Circuit has declined to apply the good faith exception to a warrantless search based on the officer's mistaken, but good faith, belief that the search was justified. *United States v. Moss,* 963 F.2d 673 (4th Cir. 1992). The seizure of the materials from Fancher's home was warrantless. Notwithstanding Trooper Loudin and Senior Trooper Boggs' bona fide belief that circumstances existed which justified their warrantless seizure, the *Leon* good faith exception is unavailing to support the police seizure of the computer, the spiral notebook and the pictures from Fancher's house.

**Recommendation**

Upon consideration of the consents Fancher gave to the police to enter his house and search and upon consideration of that which the police observed in plain view and seized from Fancher's home it is the undersigned's **RECOMMENDATION** that Defendant's Motion To Suppress be **DENIED** and that the computer, the pictures and the black spiral notebook seized and removed from Defendant's residence pursuant to the police's warrantless search and seizure **NOT BE SUPPRESSED.**

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the proposed Report and Recommendation to which objection is made and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United

States District Judge. Failure to timely file objections to the proposed Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the United States District Court for the Northern District of West Virginia is directed to mail an authenticated copy of this proposed Report and Recommendation to counsel of record.

DATED: June 17, 2005

/s *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE